IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**DAPHINE DOREENE ALFORD**                                             **PLAINTIFF**

v.                                                CAUSE NO. 1:16CV19-LG-RHW

**THE CITY OF WIGGINS, MS;
MAYOR JOEL T. MILES; CHIEF OF POLICE
MATT BARNETT; POLICE OFFICERS
RANDY VINSON, DOUGLAS MCBRIDE,
and OFFICERS JOHN DOES 1-5,
Individually and in their official capacities**                **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER
## GRANTING MOTIONS FOR SUMMARY JUDGMENT

BEFORE THE COURT are Motions for Summary Judgment and Qualified Immunity filed by Defendants Randy Vinson [56] and Douglas McBride [63]. Vinson and McBride were police officers for the City of Wiggins, Mississippi when the events at issue in this civil rights lawsuit occurred. They assert they are immune from Plaintiff Daphine Alford's claims against them in their individual capacities. The issues have been fully briefed. After due consideration, the Court finds that Vinson and McBride have shown they are entitled to qualified immunity. Additionally, to the extent Alford alleged state law claims against Vinson and McBride, the Mississippi Tort Claims Act provides immunity from those claims. Accordingly, the Motions will be granted and the claims against Vinson and McBride dismissed.

BACKGROUND

This case arises out of events occurring in the late evening of January 24, 2013. Alford, a black female, alleges that on that night she was standing on a street

corner in Wiggins, Mississippi, conversing with her male companion. She alleges she was arrested by Wiggins Police Officers Randy Vinson and Douglas McBride, both white, even though "[s]he was not a suspect, not acting suspiciously and was not observed committing any criminal act." (Compl. 10, ECF No. 1). After her arrest, she was "crudely, improperly and illegally searched," whereupon the officers found "narcotic paraphernalia." (*Id.*). She was then "roughly manhandled," handcuffed and forced into the police vehicle for transport to the Stone County Correctional Facility. (*Id.* at 11).

Upon reaching the Correctional Facility, Alford alleges that Officer Vinson "intentionally tripped and twisted her off-balance causing her to unexpectedly fall forward, face first, directly into the pavement with the blunt impact injuring her head, face, teeth and body." (*Id.*). She alleges that Vinson and McBride dragged her into the Correctional Facility while she loudly cried out from the intense pain. (*Id.*).

Inside the Correctional Facility, Alford alleges she was manhandled into a small jail cell, where she was forced to the floor. She alleges Vinson kneeled on her face, jaw, and neck to keep her down as she was stripped naked, and Vinson touched her inappropriately while "the other Wiggins officer watched." (*Id.*). Later, Vinson, who had moved to a different area, returned to the area of the cell,

> where Ms. Alford was protesting what they had done to her. When [Alford] saw Officer Vinson staring at her she became completely emotionally overcome and outraged by what he had just done to her. A Corrections Officer then sprayed pepper spray . . . in [Alford's] face and body even though she was nude, required medical attention for her

-2-

injuries and was not a threat to anyone.

(*Id*. at 13).

Alford alleges she was only able to wash the pepper spray from her body using "a dirty cell commode's unsanitary toilet water." (*Id*.). Her pleas for help and assistance were ignored by "the two Wiggins Officers" while they were nearby writing up false criminal charges against her. (*Id*.).

Vinson and McBride have provided evidence concerning the incident in the form of videos from the patrol car and inside the Stone County Correctional Facility.[1] The patrol car video does not show the officers' initial contact with Alford, but once she is in the back of the car her commentary can be heard. She accuses the officers of bruising her face, calls them "white boy," "cracker," and "motherfucker," and tells them she had been on crack since she had been in Wiggins. Once the car arrives at the Correctional Facility, the video shows Alford resisting the officer's attempts to make her walk to the receiving door, and his move to bring her to the ground. He is holding her shoulders as he does so, and she swings down to hit the ground on her side. The two officers help Alford to her feet and they proceed to the entrance.

As Alford is brought through the door, she is clearly resisting and sits down on the ground. She can be seen struggling against the officers as they clear the detox cell of an occupant. Two female correctional officers enter the cell wearing

---

[1] The videos, filed under seal, are exhibits I and J to Vinson's Motion, and C, D, N and O to McBride's Motion.

latex gloves, followed by a third. Shortly thereafter, the two police officers leave. About five minutes later, the three female correctional officers leave the cell. Alford appears naked in the door window, and an object can be seen flying past the window. Five correctional officers gather in front of the door, and one readies what appears to be a spray can. As the officers enter, Alford pushes her way out of the cell, but is pulled back in by one of the officers. There is a struggle inside of the cell involving all five correctional officers and Alford, during which the mattress and other items are removed. The officers then leave, and it appears that Alford has been subdued, as she does not appear in the window for the remaining few minutes of the video.

     The officers also provided Alford's deposition testimony explaining her version of the events of that night. She testified that she had gone to "The District" in Wiggins, where drug activity goes on. (Alford Dep. 35-36, ECF No. 56-1). She went there to buy crack cocaine. (*Id*. at 38). She was there six hours, during which time she did crack and drank alcohol. (*Id*. at 39-40). She was walking and drinking gin with her friend "Jethro" when officers Vinson and McBride approached them. (*Id*. at 43, 47). Vinson spoke to "Jethro" while McBride asked her her name. (*Id*. at 46). Vinson told McBride not to worry about Alford, because "[s]he's just an old nothing crack head." (*Id*. at 49). Alford became upset at this comment and cursed at Vinson ("I probably said something to [the] effect" of I'm going to kick your ass), "and that's when the handcuffs came out." (*Id*. at 49, 50). The officers forced her to the patrol car and handcuffed her. (*Id*. at 50). Vinson searched her and found a

crack pipe in her pocket.  (*Id*. at 51).  The officers wanted to inspect her shoes as well, so as she got into the car she kicked her shoes off toward Vinson.  (*Id*. at 53).

On the drive to the Correctional Facility, Alford testified she was "yelling. I'm screaming.  I'm talking about them.  I'm talking about how they should be ashamed, don't know how their wives deal with them, all kind of things.  They never said a word the whole time."  (*Id*. at 58).  Officer Vinson took her out of the car at the Correctional Facility, and [h]e "goes, 'Stop spitting.  Stop spitting.'  And then all of the sudden, he trips me."  (*Id*. at 63).  She testified she landed on her face and chipped her teeth.  (*Id*. at 65).

Alford testified that Vinson and McBride forcefully picked her up and brought her into the female detox room, which she was familiar with because she been in the room about ten times previously.  (*Id*. at 70-72).  She was "agitated because of what happened to my teeth."  (*Id*. at 75).  Vinson pinned her down in the far corner of the room with his knee in her jaw, and "I'm thinking my jaw is about to break any minute."  (*Id*. at 76).  Alford was stripped from the waist down, and told Vinson she would stop struggling.  (*Id*. at 76-77, 85).  Vinson "unpinned" her, and "I just kind of freaked out.  I just grabbed the tray and just started, you know swinging the tray and trying to defend myself because I didn't know what they were gonna do next." (*Id*. at 77, 79).  "I was just screaming and hollering, doing this number with the tray (demonstrating).  I didn't hit anybody . . . .  I guess by me doing that, [the corrections officer] just automatically just pulled out her mace."  (*Id*. at 80-81).

Alford's claims are pursuant to 42 U.S.C. § 1983 under the Fourth and Fourteenth Amendments for excessive force, and false arrest, detention, imprisonment, and prosecution. (Compl. 30-31, ECF No. 1). Additionally, she alleges the officers were engaged in a conspiracy to abuse minorities pursuant to 42 U.S.C. § 1985. (*Id.* at 31). She may also have made state law tort claims, although none are explicitly set out in the Complaint. Vinson and McBride move for summary judgment on all of the claims, asserting the defense of qualified immunity.

I. <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure permits any party to a civil action to move for a summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law. A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The movant need not negate the non-movant's claims. Instead, the movant need only show the absence of evidence to support a claim on issues to which the non-movant bears the ultimate burden of proof at trial. *Id*. at 323-24. Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *Id*. at 324-25. The non-movant may not rest upon mere allegations or denials in its pleadings, but must set forth specific

facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

II. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Thompson v. Mercer*, 762 F.3d 433, 436-37 (5th Cir. 2014). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to show a violation of a clearly established constitutional right. *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014). Accordingly, when a defendant pleads qualified immunity as an affirmative defense and moves for summary judgment, a court must decide: "(1) whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right; and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). A court may determine these questions in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). As to the second prong, a government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then

known that the defendant's conduct violated the plaintiff's rights. *Carroll*, 800 F.3d at 169.

## DISCUSSION

I. Probable Cause to Arrest

To prevail on her false arrest claim, Alford "must sufficiently allege (1) that she was arrested, and (2) the arrest did not have the requisite probable cause." *Rhodes v. Prince*, 360 F. App'x. 555, at *3 (5th Cir. 2010) (citing *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655-56 (5th Cir. 2004)). "An arrest is unlawful unless it is supported by probable cause." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004).

> "Probable cause to arrest exists if, at the moment an arrest is made, the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent man in believing that the suspect has committed or is committing an offense," but "[e]nough evidence to support a conviction is not required."

*Davis v. Strain*, No. 16-30169, 2017 WL 344285, at *2 (5th Cir. Jan. 23, 2017) (quoting *United States v. Morris*, 477 F.2d 657, 663 (5th Cir. 1973)).

Both Vinson and McBride argue that they had probable cause for arresting Alford, because there is no factual dispute regarding Alford's criminal behavior of 1) public drunkeness; 2) consuming crack cocaine; 3) possession of drug paraphernalia; 4) public profanity; and 5) resisting arrest. Any one of these criminal offenses provided the officers with probable cause to arrest Alford, and she testified that she committed the crimes. (Alford Dep. 91-92, 114, ECF No. 61-1). Vinson and McBride

are entitled to qualified immunity in regard to the claim of wrongful arrest because the undisputed facts do not show a constitutional violation.

## II. Fourth Amendment Excessive Force Claim

Alford's allegations of excessive force implicate the Fourth Amendment rather than the Fourteenth Amendment. "All claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether a seizure is reasonable under the Fourth Amendment depends not only upon whether the seizure itself is reasonable, but also upon how the police seize the individual. *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Although the Fourth Amendment's prohibition of the use of excessive force by the police against seized persons was clearly established prior to the incident at issue in this case, the Court must ensure that the law is "particularized" to the facts of the case. *White v. Pauly*, 137 S. Ct. 548, 552 (2017). This requires that the Court "identify a case where an officer acting under similar circumstances as [officers Vinson and McBride] was held to have violated the Fourth Amendment." *Id.*

### a. Officer Vinson

#### 1. The Take-Down by Officer Vinson

Alford challenges Vinson's action of 1) tripping her while escorting her from the patrol car to the Correctional Facility entrance; and 2) kneeling on her head to restrain her while she was strip searched. Viewing the evidence in the light most

-9-

favorable to Alford, but also as depicted by the surveillance video,[2] the Court finds that the use of force applied by Vinson was objectively reasonable given the totality of the circumstances. An arrest "necessarily carries with it the right to use some degree of physical coercion." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 396). Here, as Vinson attempted to escort Alford into the Correctional Facility, she can be seen attempting to move in a different direction and escape his grasp. Alford's movements, along with her behavior and language prior to arriving at the Correctional Facility, made it objectively reasonable for Vinson to believe that Alford's non-cooperation posed a threat to himself and McBride. Bringing Alford to the ground in the controlled manner shown in the video was an objectively reasonable uses of force given the totality of the circumstances. *See Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012).

      2. Pinning Alford to the Floor

Alford contends that Vinson used excessive force once she was in the detox cell by pinning her to the floor with his knee on her head. Vinson argues this was necessary because 1) Alford was yelling and struggling against him and others as he brought her to the cell where he would be able to remove her handcuffs and allow her to cool down; and 2) once in the cell she continued to fight the female

---

[2] The Court "need not rely on plaintiff's description of the facts where the record discredits that description but should instead consider 'the facts in the light depicted by the video.'" *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

correctional officers who were attempting to strip search her.

"There is no bright-line rule forbidding police officers from using a knee to pin an arrestee to the ground." *Poole v. Russell*, No. CV 14-0611, 2016 WL 6082041, at *6 (W.D. La. Oct. 18, 2016).

> In *Castillo v. City of Round Rock, Texas*, for example, the Fifth Circuit held that officers had not used excessive force where they had restrained plaintiff "in the prone position on the ground, eventually handcuffing his hands behind his back," even though (1) one officer and a bystander "remained on [plaintiff's] back for four to six minutes;" (2) the officer "shoved his knee in the back of [plaintiff's] neck and kept it there for some five to ten minutes;" and (3) the plaintiff later died of asphyxiation. *Castillo v. City of Round Rock, Texas*, 177 F.3d 977, at *1 (5th Cir. 1999) (unpublished). The Court explained that the plaintiff had "actively resist[ed] by kicking and yelling" and had bloodied one officer's nose "in a manner that a reasonable officer could perceive as hostile." *Id.* at *3. The officers had not acted unreasonably when they placed the plaintiff in the prone position and "incapacitat[ed] him as quickly and professionally as possible, by climbing on top of his back and securing his hands and legs . . . ." *Id.*

*Id.*

Also, in *Deshotels v. Marshall*, 454 F. App'x 262 (5th Cir. 2011), the Fifth Circuit considered the use of force in subduing a burglary suspect. The court found that officers' straddling of the suspect, pulling on his arms, kneeling on his shoulder, and folding of his legs to stop him from kicking were all objectively reasonable, considering the size of the suspect and his immediate attempts to flee. *Id.* at 267-68.

The facts of this case, and the evidence provided by the surveillance video, establish that a reasonable officer could have believed that Alford was a threat to herself and the other officers such that it was necessary to pin her to the floor with

-11-

a knee while correctional officers searched her to ensure she did not have any dangerous objects on her body. This was an objectively reasonable use of force rather than a violation of the Fourth Amendment.

    b. Officer McBride

McBride's actions that are the subject of Alford's Complaint are that he forced her to the patrol car and frisked her, pulled her into the patrol car from the opposite side, and was present during the strip search in the correctional facility. Alford does not point to any case law clearly establishing that McBride's actions violated the Fourth Amendment. McBride points to a number of cases in which actions similar to his were held not to be constitutional violations. *See, e.g.*, *Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002) (strip search of a male inmate in front of female guards); *Williams v. Bramer*, 180 F.3d 699, 704 (5th Cir. 1999) (choking occurred while officer attempted to search detainee's mouth). Alford has the burden of demonstrating "that the specific circumstances which the officer encountered would have led a reasonable officer to understand that his actions were unlawful, in light of clearly established authority of which a reasonable officer would have known." *Strickland v. City of Crenshaw*, 114 F. Supp. 3d 400, 418 (N.D. Miss. 2015). Because she has not done so in regard to Officer McBride's actions, he is entitled to qualified immunity as to the excessive force claim.

Alford argues that McBride can be liable for violating the Fourth Amendment because he stood by as Vinson tripped Alford, choked her, and kneeled on her head to restrain her while she was stripped of clothing. McBride objects that Alford did

not bring a bystander liability claim, and it is improper for her to argue that the theory applies at this stage. The focus of the bystander liability inquiry is on whether the bystander officer has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). In resolving whether a plaintiff has sufficiently alleged a bystander liability claim, a court must also "consider whether an officer 'acquiesce[d] in' the alleged constitutional violation." *Whitley v. Hanna,* 726 F.3d 631, 647 (5th Cir. 2013) (citing *Hale*, 45 F.3d at 919). As the Court found no constitutional violation by Vinson, McBride can have no bystander liability.

III. Criminal Charges

Alford asserts that the Officers violated her Fourth and/or Fourteenth Amendment rights because they "filed false felony charges resulting in false incarceration and improper imprisonment." (Compl. 31, ECF No. 1). The initiation of criminal proceedings without probable cause is not a violation of substantive due process. *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003). "The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection – the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued." *Id*. However, "causing charges to be filed without probable cause will not without more violate the Constitution." *Id*. Here, the Court has explained that there is no genuine dispute that Vinson and McBride had probable cause to arrest Alford for the numerous crimes she agrees she committed. Therefore they

had probable cause to initiate criminal charges. Accordingly, to the extent Alford asserts a constitutional cause of action for false charges or prosecution, Vinson and McBride have shown they are entitled to qualified immunity.

IV. <u>Individual Immunity - State Law Claims</u>

Although it is not clear in Alford's Complaint, she may have alleged state law claims of false arrest, malicious prosecution, false imprisonment, intentional infliction of emotional distress, assault and battery against Vinson and McBride. The Mississippi Tort Claims Act provides the exclusive remedy against a governmental entity or its employee. Miss. Code Ann. § 11-46-7(1). Thus, "[a]ny claim filed against a governmental entity and its employees (for monetary relief) must be brought under [the] statutory scheme" of the MTCA. *Stuckey v. Miss. Dep't of Transp.*, No. 3:07-cv-639-TSL-JCS, 2008 WL 1868421, at *2 (S.D. Miss. Apr. 24, 2008); *Lang v. Bay St. Louis/Waveland Sch. Dist.*, 764 So. 2d 1234, 1236 (Miss. 1999).

Officers Vinson and McBride contend they are immune from suit regarding any tort claims Alford may be alleging due to two immunity provisions in the MTCA. McBride asserts immunity under section 11-46-9(1)(c) (actions related to police protection), and Vinson asserts immunity under section 11-46-7(2) (actions taken in the course and scope of employment).

Under section 11-46-7(2), "no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties," and there is a rebuttable presumption that a given act is within that scope. Miss. Code

Ann. § 11-46-7(7). *See Hearn v. Bd. of Sup'rs of Hinds Cty.*, 575 F. App'x 239, 243 (5th Cir. 2014). However, "an employee shall not be considered as acting within the course and scope of his employment . . . if the employee's conduct constituted [ ] fraud, malice, libel, slander, defamation or any criminal offense." Miss. Code Ann. § 11-46-7(2).

Alford has not adequately rebutted the presumption that Officers Vinson and McBride were acting within the course and scope of their employment when they arrested her, brought her to the Correctional Facility, and filed criminal charges against her. These actions were taken because they were the officers' job duties; the decisions to arrest, detain and charge Alford were undertaken in the course and scope of Vinson and McBride's employment as police officers for the City of Wiggins. Vinson and McBride are immune from tort liability under section 11-46-7(2).

Under section 11-46-9(1)(c) of the MTCA, an employee is not liable for any claim "arising out of any act . . . in the performance or execution of duties or activities relating to police or fire protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury." "[R]eckless disregard is synonymous with willfulness and wantonness and . . . includes an element of intent to harm." *Cunningham ex rel. Cunningham v. City of W. Point.*, 380 F. App'x 419, 422 (5th Cir. 2010) (quoting *Foster v. Noel*, 715 So. 2d 174, 179 (Miss. 1998)). "[R]eckless disregard" is "a higher standard than gross negligence and embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Porter v.*

*Farris*, 328 F. App'x 286, 288-89 (5th Cir. 2009) (quoting *City of Greenville v. Jones*, 925 So. 2d 106, 110 (Miss. 2006)). Alford makes an assertion that Vinson "clearly acted with reckless disregard" for her safety and well-being at a time she was in handcuffs and not engaged in criminal activity. (Pl. Resp. Vinson Mot. 6, ECF No. 76; Pl. Resp. McBride Mot. 8, ECF No. 77). However, the surveillance video does not support her characterization of Vinson's actions. While she was handcuffed, Alford tried to evade Vinson's grasp and did not appear to be cooperating with him. Vinson tripped her as he escorted her into the Correctional Facility, but the video shows he controlled her fall. The officers then lifted Alford up and she walked into the doorway of the Correctional Facility between them. No evidence shows reckless disregard for Alford's safety. Accordingly, the officers are immune from tort liability under section 11-46-9(1)(c).

## CONCLUSION

In the context of summary judgment, a police officer is protected by qualified immunity unless a genuine issue of material fact exists regarding whether his actions were objectively reasonable. *Byers v. City of Eunice*, 157 F. App'x 680, 683 (5th Cir. 2005). Officers Vinson and McBride used the force necessary to safely arrest and detain a combative Alford, who was admittedly engaging in criminal activity and under the influence of cocaine and alcohol. "[E]ven law enforcement officials who reasonably but mistakenly use excessive force are entitled to immunity." *Wagner v. Bay City*, 227 F.3d 316, 321 (5th Cir. 2000) (citations and quotations marks omitted). The Court finds no question of material fact regarding

the reasonableness of Vinson's or McBride's actions. It would not be apparent to a reasonable officer that his conduct was unlawful in the circumstances existing at the time of Alford's arrest and detention. The summary judgment motions on the grounds of qualified immunity will be granted in all respects.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [56] Motion for Summary Judgment and Qualified Immunity filed by Defendant Randy Vinson and the [63] Motion for Summary Judgment and Qualified Immunity filed by Defendant Douglas McBride are **GRANTED**. Plaintiff's claims against the defendants in their individual capacities are **DISMISSED**.

**SO ORDERED AND ADJUDGED** this the 8th day of March, 2017.

s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
CHIEF U.S. DISTRICT JUDGE